# IN THE COURT OF APPEALS OF IOWA

No. 16-0110
Filed February 8, 2017

IN RE ESTATE OF MILTON A. BOMAN, deceased

WESLEY BOMAN,
     Plaintiff-Appellee,

vs.

CYNTHIA CRAMER, Individually and as Executor,
and TRUDY BURFORD,
     Defendants-Appellants.
_____

Appeal from the Iowa District Court for Hancock County, Gregg R. Rosenbladt, Judge.

Two sisters appeal various rulings in their brother's successful lawsuit contesting their father's will and alleging tortious interference with his inheritance. **AFFIRMED.**

Stephen H. Locher and Emily M. Schirmer of Belin McCormick, P.C., Des Moines, for appellant Cynthia Cramer.

Deborah M. Tharnish of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellant Trudy Burford.

Nathan J. Schroeder and David J. Dutton of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellee.

Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

Cynthia Cramer and Trudy Burford, daughters of Milton and Helen Boman, appeal jury verdicts in favor of their brother, Wesley Boman, in his lawsuit contesting their father's will and alleging tortious interference with inheritance. On appeal, Cynthia and Trudy argue the district court should have granted their motion for judgment notwithstanding the verdict or a new trial because Wesley did not offer sufficient evidence to support the verdicts.[1] We find no error in the court's refusal to disturb the verdicts or the jury's award of punitive damages. Because the admission of improper opinion testimony from Wesley's expert constituted harmless error, we affirm.

## I.        Facts and Prior Proceedings

Cynthia, Wesley, and Trudy grew up on the Boman farm bordering Pilot Knob State Park in Hancock County. When Wesley was in high school, he started farming with his father. Wesley attended Iowa State University and worked for a stint at Winnebago Industries but always returned to help Milton with the farming operation. Meanwhile Trudy and Cynthia moved away from the farm. Trudy and husband Tom lived in Texas for seven years before moving to Johnston, Iowa. Cynthia and husband Bob lived in Boone.

Wesley later substituted as a mail carrier while he farmed with his father, sharing the farm's profits on a fifty-fifty basis. Milton had coronary bypass surgery in 1991, limiting his ability to do heavy work and increasing his reliance

---

[1] Wesley named three defendants: Cynthia and Trudy, individually, and Milton's estate, Cynthia as executor. The defendants' counterclaim alleged Wesley converted property belonging to Milton or Milton's estate. The jury ruled in favor of Wesley on the counterclaim, and the defendants do not appeal that verdict.

on Wesley. While farming with his father, Wesley and his first wife, Jayne, spent thousands of dollars to remodel a small house on the farmstead, in which they lived rent-free.

In 1997, Britt attorney Earl Hill started helping Milton and Helen with their estate planning, and that year Hill drafted their revocable trust instrument.[2] Under this trust, upon their parents' deaths, Wesley and Trudy would serve as trustees, and each would receive one-half of the trust's net income for twenty-five years. Thereafter, Wesley and Trudy would each receive one-half of all trust assets (personal and real property). Cynthia disclaimed any share in the trust because she felt she was "sufficiently provided for by her husband."[3]

The trust went through a series of amendments. A 1999 amendment again specified Wesley and Trudy would receive one-half of the net trust income but reduced the income period to ten years. Wesley also received all farm machinery and tools. For the first time, Cynthia received one-third of the personal property, along with her siblings. Among the personal properly Cynthia expected to receive was a burled-wood chest of drawers, considered an important family heirloom from Sweden. Trudy and Wesley again received one-half of the estate and remained the trustees.

Wesley and Jayne had three daughters before they divorced in 2000. During the last year of his marriage and through his difficult divorce, Wesley started using marijuana and cocaine. Subsequently, he completed six weeks of inpatient substance abuse treatment. Wesley believed his parents were proud of

---

[2] Before the trust, Milton had executed a will in 1965 bequeathing his property to the three children in equal shares.

[3] At the 2015 trial, Cynthia testified her individual net worth exceeded $1.5 million.

his efforts to get clean, but his sisters were less supportive. Wesley admitted relapsing several times after his inpatient treatment.

In August 2001, Helen and Milton again amended the trust. Attorney Hill testified the impetus for the amendment was their concern about Wesley's drug addiction. While the interests of Wesley, Cynthia, and Trudy remained unchanged, Milton and Helen wanted to ensure that if Wesley predeceased them, his share would pass to his children and would be held in the trust until Wesley's youngest child was twenty-one years old.

In the fall of 2001, Helen and Milton moved off the farm and into a condominium in nearby Garner, telling Wesley to move into the main farmhouse. Milton gave Wesley his interest in the farm machinery.[4] Thereafter, Wesley and Milton continued to make joint decisions as to the farming operation. After Wesley moved into the main farmhouse, he rented out the smaller home. According to Wesley, his father told him to keep the rent.

Because the Garner condo was close to the farm, Wesley was able to assist his parents by paying their bills and arranging services. For instance, Wesley scheduled cable service at the condo. The equipment installer struck a deal with Wesley that his parents would not be charged for the service if Wesley would allow the installer to hunt on the farmland. Wesley also helped manage his parents' health issues as Wesley held their medical power of attorney. Helen and Milton both suffered from type 2 diabetes.

---

[4] At trial, Wesley provided receipts showing he paid for one-half of some of the farm equipment.

In 2005, Milton and Helen amended the trust, revoking the prior amendments and again giving Wesley and Trudy each one-half shares. Trudy and Wesley remained successor co-trustees after their parents' deaths. Wesley still had the right to purchase Trudy's share of the farm. Attorney Hill testified the parents made the 2005 amendment because they wanted Wesley to be able to continue farming without having "the land sold out from under him." If Wesley did not survive his parents, Cynthia was appointed trustee of Wesley's share, which she could not distribute until Wesley's youngest child reached thirty years of age. Then Cynthia could terminate the trust.

Wesley met his second wife, Cherie, in 2006. Cherie, her son, and her grandson moved in with Wesley. For Wesley's birthday in 2007, Cheri arranged a video recording of Milton and Helen sharing memories about their son. In the video, Helen professed her love and admiration for Wesley. Also on the video, Milton acknowledged difficulty in recalling details of Wesley's youth, saying: "My memory is so shot." At this time, Cherie's daughter, Jessica, and her family rented the small house Wesley had remodeled. Jessica also was a caretaker for Milton and Helen as they aged, and Helen developed a close relationship with her.

Cherie and Wesley married on January 1, 2008. Wesley's parents initially embraced his second marriage, serving as best man and matron of honor at the wedding. In early February 2008, Milton turned ninety years old. Also in 2008, Milton took medication for Alzheimer's. Later that year, family relationships started to fray. When Helen had to be hospitalized in Britt for a diabetic ulcer on her foot, Wesley arranged for Milton, who could not care for himself, to stay at

the Summit House, an assisted-living facility attached to the Britt hospital. Both facilities are near the Boman farmstead. Helen joined Milton after being released from the hospital but was unhappy at the Summit House and made it clear to Wesley she wanted to return with Milton to the Garner condo. Based on medical advice, Wesley believed Helen and Milton should remain near the hospital. When Wesley refused Helen's requests, she became very angry with him. The sisters then stepped in. On July 23, 2008, Helen and Milton executed powers of attorney, including medical powers, making all three children attorneys-in-fact with the "agreement of any two children" binding. The sisters then acceded to Helen's request.

Wesley believed his parents' return to the condo caused further deterioration of Helen's foot ulcer. Wesley and Cherie drove his parents to Des Moines for doctors' appointments, and Trudy met them at the first appointment. Trudy and Wesley argued about whether Helen needed to go to the second foot appointment. Eventually, Helen required hospitalization following the amputation of her toe on August 15, 2008. For Helen's post-hospital assisted living, Cynthia found The Cedars in Madrid, Iowa. Over Wesley's objections, Helen and Milton moved to The Cedars, which was closer to Cynthia's Boone home and Trudy's Johnston home, but one and one-half hours from the Boman farm where Wesley lived and from the parents' community and likely visitors. The sisters frequently visited their parents at The Cedars but stopped speaking with Wesley.

In 2009, Cynthia and Trudy took over the tasks Wesley had performed for their parents, helping with bills and other obligations while their parents' care at

The Cedars continued.[5] That January, attorney Hill met with Milton, Helen, and Cynthia and then commenced drafting the fourth amendment to the trust, which wrought the most significant change. Hill testified the fourth amendment was prompted by Helen's unhappiness with a phone call from Cherie and the parents' desire to prevent Cherie from owning their farmland. Milton and Helen converted Wesley's outright interest in one-half of the farm upon their death to the equivalent of a life estate. During the life estate some of the farm and investment income would be paid to Wesley at Cynthia's discretion. At Wesley's death, the trust was slated to terminate and the principal and income would be distributed per stirpes to Trudy and Cynthia. According to attorney Hill, "Helen and Milt decided they wanted no opportunity for [Cherie] to have her name on property that they had worked so hard to accumulate." Despite the fact Wesley was still helping his father make farm decisions, neither sister informed Wesley of the fourth amendment.

In June 2009, Helen and Milton left The Cedars and returned to their Garner condo. In July 2009, Milton's doctor noted slowly progressive memory loss. Over that summer, Wesley's relationship with his parents worsened. Cherie remained a point of contention with Helen. Helen, described by trial witnesses as strong-willed, grew upset when Wesley visited less often after his marriage to Cherie.

Helen returned to the hospital in fall 2009. When she was discharged, Cherie and Wesley picked up his parents and drove them to The Cedars. Coinciding with the parents' move, attorney Hill again met with Cynthia and her

---

[5] Wesley pointed out at trial that also during 2009, the values of Iowa farmland doubled.

parents before drafting a September 2009 restatement of the trust to equalize the income generated by the tracts of real estate owned by the Bomans. On September 16, 2009, Hill sent his revisions to Bob and Cynthia.

In May 2010, the parents lobbied to return to the Garner condo. Despite reservations from The Cedars staff, who believed Milton and Helen were not ready to live independently, Trudy returned her parents to the condo. Wesley tried to stay in contact with his parents through 2010, but his relationship with his mother had deteriorated after her time at The Cedars. Helen would "dig" at Wesley and make accusations about him. If Milton was around when Helen would say negative things to Wesley, Milton would admonish her, "Helen, for goodness sakes. Leave Wes alone." According to Wesley, his sisters' false statements caused him to fall out of favor with his mother to the point Helen continually called Wesley to berate him and express what a disappointment he was to his parents. Eventually, Wesley refused to take Helen's calls and declined to visit.

In early January 2011, Milton's doctor noted he was sleeping more and was "quite demented." In the spring of 2011, several events added to the friction between Wesley and his parents. An employee with the Iowa Department of Human Services (DHS) came to the Garner condo to investigate an allegation of dependent-adult abuse against Helen. Although the abuse was determined to be unfounded, Helen was devastated and blamed Wesley, though the complaint was actually filed by Cherie's daughter, Jessica, who had been Milton's caretaker.

On April 10, Helen asked Wesley and his cousin, Steve Boman, to meet with her and Milton. During the meeting, Wesley suggested the proper division of his parents' estate would be one-third for each sibling with Steve serving as a paid executor. Wesley said he did not want to be under "Bob and Cynthia's thumb." During this same time period, the sisters contacted Steve Boman and told him they "thought Wesley was in trouble with drugs again." At trial, Trudy admitted she had not personally seen Wesley doing drugs, but the sisters "wondered" if Wesley was doing drugs based on his behavior.

On April 12, Cherie and Helen had an unpleasant phone call, in which Cherie said she now understood why Milton had extramarital affairs. Cherie testified she almost immediately regretted the harsh words, but she had been frustrated by Helen's treatment of Wesley, who was "so shook up" that he was not sleeping, not eating, "just couldn't figure out why he was being thrown to the wolves." Helen was upset and described the phone call to Trudy.

Trudy, in turn, compiled a timeline of incidents (dating from 1954 to the present) that she believed showed Wesley's "abuse" of their parents. On April 18, Trudy's husband, Tom, emailed the timeline to attorney Hill so he could "discuss the content" with Milton and Helen during an appointment the next day. On April 20, Milton's doctor noted Milton was "[s]miling, happy, but totally disoriented." According to Hill, he had discussed lawyer-client communications with Milton and Helen and they told Hill he could exchange e-mails with the sisters. The email communication offered into evidence provided the jury with strong evidence of the sisters' intent to interfere with Wesley's inheritance.

On the morning of May 10, 2011, Hill sent the sisters an e-mail with a draft letter to Wesley incorporating "the changes suggested in your e-mails." The letter advised Wesley of three developments: (1) he would start paying monthly rent on the farmhouse as of June 15; (2) it was not his responsibility to lease the southeast acreage that would soon be vacant; and (3) he was finally advised that "according to the Restatement of the Boman Trust . . . you have been given a life estate in the residence and surrounding buildings [on the NE property.] You may also, depending on the discretion of the trustee, share in the net income from the SE [property]." Hill closed by telling Wesley to contact him—"You are not to directly contact Milt or Helen Boman in any manner as related to these subjects." Wesley testified the letter was his first news of the trust's change to a life estate.

The unpleasantries between Helen and Cherie continued during May. Helen left voicemails calling Cherie a "real bitch" and threatening to contact the sheriff regarding Wesley. When Helen telephoned again, Cherie called Helen an "old hag" and hung up. Cherie left a message for attorney Hill on May 26, asking him to curtail the harassing telephone calls from Helen. On May 26, Milton's doctor described him as "pleasantly demented." The next day, Hill e-mailed the sisters to tell them about Cherie's message—"I would not characterize it as a nasty call, but certainly passionate." Hill expressed his belief Helen should stop making such calls and asked for the sisters' input.

Trudy responded on May 27, telling Hill that Helen "won't ever contact [Wesley] again." Trudy wrote: "Wesley has been a source of a lot of problems throughout the years for them . . . . It sickens me that Wesley has chosen to ignore and neglect them." An hour later, Trudy sent Hill another e-mail, saying

Helen told her "Wes and Cherie called Mediacom and had Mom and Dad's [television] disconnected." Trudy continued: "It seems Wes knew an employee who hooked them up for free. Mediacom received a 'tip' from a woman about Mom and Dad receiving free service." Milton felt ashamed by the implication he was stealing cable. Without discussing the matter with Wesley, the sisters blamed him for shutting off the cable. Wesley pointed out the sisters were handling their parents' bills then and knew they had not paid for cable service.

Also in her second May 27 e-mail, Trudy told Hill: "Because Wesley doesn't come to see them and is unkind to them, Mom said that they are discussing cutting him out of the trust entirely." Trudy asked for Hill's view on the viability of that option. Hill replied, telling both sisters on May 28, the Saturday of Memorial Day weekend:

> I really don't know what to say. Any attempt to change the trust at this point, could, in my opinion, be challenged on grounds of competency. You know your parents mental condition better than I. While I think we would be successful with respect to your mother, I'm not so sure with respect to your dad.

About an hour later, Cynthia e-mailed Hill, including Trudy and both husbands on the communication. She asked for Hill's thoughts, stating:

> As to my parents, I was wondering if we could handle this problem by destroying the trust—the main reason that they drew it up was to keep the farm out of Wesley's name. Instead handle the estate through their wills—with the benefits going to Trudy and [me], thus leaving out Wesley.

Hill replied in the early morning hours of Sunday, May 29: "Terminating the trust would certainly be a way to go if the wills are set up correctly." Hill noted the will provisions would be important "to make sure it goes where you want." Hill explained the mental capacity necessary to make a will was "a fairly low

standard." Hill opined, if Milton gave all his assets to Helen, "I don't think we have a court in Iowa that would overturn the will if challenged. Whatever you decide, I think we should do it quickly."

Trudy's next e-mail to Hill was on Tuesday evening, May 31, stating "It appears Wes is collecting monies/income related to the farm that he is not giving to Mom and Dad." Trudy made allegations as to the farm equipment and the rental of crop and pasture land. Trudy asked Hill: "So what can we do? Shall we wait and see whether he is selling the equipment and then press charges? Should we contact the [auctioneer] and let him know that the equipment is not Wes's to sell and if they auction it they will be selling stolen goods?" At no point did the sisters ask Wesley himself about ownership of the farm equipment. Trudy concluded, after the parents' multiple visits to the farm with each sister around Memorial Day weekend:

> Mom and Dad are ready to create new wills that will exclude Wes entirely from any inheritance. The thought being that he has already received his inheritance throughout the many years that they have supported him . . . . [W]e do have a concern that if Mom passed first, that Dad could still change his will and get Wes back in the picture.

For her part, Cherie was so upset by Cynthia driving through the farm yard that she took a hammer and "whacked" the side of the Swedish chest that was being stored in the barn and that Cynthia was to receive as a bequest. Before the June 15 rent deadline, Wesley and Cherie bought a house and moved off the farm.

On June 1, 2011, Hill told the sisters to "be very careful" as "ownership of the machinery will be critical. Without your Dad's help that may be a significant

issue." Regarding the proposal that Milton and Helen execute new wills, Hill advised: "There is what is called a joint and mutual will . . . . You are correct in that following the death of the first spouse, the will cannot be changed."

On June 6, Wesley sold farm machinery at an auction in Floyd. Helen called Hill to report that someone from Garner told her Wesley had sold machinery that morning. Hill told Helen it was time to take action. According to Cynthia, Milton and Helen were crushed when they learned that Wesley had sold the equipment, and Helen wanted to pursue criminal charges. That same day, Hill had a conference call to discuss new estate documents with Helen, Cynthia, and Bob.[6] According to Hill, Helen made the final decision to move forward.[7] Trudy testified her parents' decision to change their estate plans was based on "a culmination" of events. After the call, Hill drafted documents to terminate the trust and create mutual wills. On the morning of June 7, Hill sent the "proposed will" to Trudy and Cynthia. "Let me know ASAP what you think."

On the afternoon of June 7, Hill and his assistant, Janice Bertilson, met with Milton and Helen at their Garner condo. Neither sister was present. Hill said he probed Milton's competency by sitting down to visit with him. Hill did not recall Milton saying why he was disinheriting Wesley. Milton and Helen executed several estate planning documents, including revocation of the trust and disinheriting Wesley. On June 8, Hill e-mailed Cynthia and Trudy, saying "both Janice and I thought your parents were capable of signing new wills. Janice was

---

[6] At trial, Hill explained Helen was vocal, and Milton was quiet. But Milton valued Bob's opinion.

[7] Hill testified he met with Milton and Helen on June 3 to discuss their estate. Wesley disputed such a meeting took place, pointing out Hill had not prepared a bill for the discussion. Hill responded he was sometimes a sloppy bookkeeper.

particularly impressed with the amount of time your father took to make the decision to sign the will. Frankly, neither of us was sure he would do so."

On July 17, 2011, Trudy told Hill the sisters were concerned about Helen's "unlimited spending" so they discussed a conservatorship for their parents but the conversation did not go well. Further, Helen had filed a complaint with the sheriff about the sale of the machinery. On July 25, Hill reiterated his reluctance concerning criminal charges. Hill also stated, "[Y]our mother will make a very poor witness and your father will make almost no witness at all."[8] On November 2, Hill again advised against taking action regarding Wesley's sale of farm equipment. Also in November 2011, Trudy sent an e-mail to Hancock County Deputy Sheriff Steve Nelson stating the sisters believed "Wesley is still connected to drugs."

Helen died in March 2012. Wesley did not attend the funeral because he was worried the "family drama"[9] would be hard on his father. The sisters asked Hill to create a voluntary guardianship/conservatorship for Milton, which was finalized at the end of March. On April 26, 2012, Hill informed the sisters he was

---

[8] The sisters complained that Cherie's daughter Jessica sold over-priced jewelry to their mother. Hill noted an earlier occasion when Helen had been very complimentary of Jessica and said how much Jessica meant to her. Hill advised the sisters not to take action.

[9] It is hard to miss the parallels this case presents to the Shakespearean tragedy of King Lear, which

> recounts the events surrounding the aging Lear's decision to divvy up his kingdom among his three daughters, Cordelia, Regan and Goneril. Looking for his progeny to bask him in love, Lear decides he will bequeath the greatest riches upon whichever daughter makes the most sycophantic incantation of devotion and adoration. When his favorite daughter, Cordelia, fails to be sufficiently obsequious in the eyes of the King, he disowns her.

*Van Horn v. Van Horn*, 393 F. Supp. 2d 730, 734 n.1 (N.D. Iowa 2005) (discussing the play's plot).

required to send Helen's will to Wesley. Cynthia replied, "I did not think he would realize what was going on until Dad died . . . . Now the cat is 'out of the bag,' unless he thinks Dad's will is going to say something else??" Hill responded, "[W]e are in good shape," explaining Milton "has a binding contract with [Helen], that became irrevocable" when Helen died. Therefore, if Wesley influenced Milton to make a new will, "it would be of no value."

When Wesley received the copy of his mother's will, he learned for the first time of his June 2011 disinheritance. Wesley met with Milton at The Cedars, showed him the will, and Milton told his son, "I don't think this is fair." When the sisters learned of Wesley's visit, they took steps to restrict Wesley's contact with Milton. Cynthia told Hill: "Trudy and I have had enough of this 'crap'!! We are ready to restrict further phone calls and visits from Wesley to Dad. Period!!!" On May 11, 2012, Hill instructed Wesley's attorney that any visits by Wesley's family with Milton had to be arranged in advance with the guardians—Cynthia and Trudy—and the visits would be monitored by another person.

Milton died on February 18, 2013. Trudy's husband sent Hill an email that night, asking him to keep Milton's death "completely confidential" because the sisters did not want Wesley to know "prior to the small service" they were planning. The sisters' plan was effective; Wesley did not learn of his father's death until after the private funeral. Milton's will was admitted to probate nine days later. Just over a month later, Tom sent Hill an e-mail stating the sisters

and their husbands had been researching 1031 exchanges[10] and seeking Hill's advice on their questions regarding an exchange or a sale of the farm.

In May 2013, Wesley filed suit. His amended petition and jury demand sought to invalidate the 2011 will on the grounds Milton lacked testamentary capacity to execute the will or Milton was unduly influenced by the sisters in executing the will. Wesley also sought damages for tortious interference with a bequest.

In September 2014, the sisters moved for summary judgment on all claims. In a detailed ruling filed on November 19, 2014, the court rejected Wesley's contention the capacity at issue for Milton was "the standard applicable to forming contracts." *See Costello v. Costello*, 186 N.W.2d 651, 654-55 (Iowa 1971). Citing *Gillette v. Cable*, the court ruled "the relevant standard here is testamentary capacity, not contractual capacity." 79 N.W.2d 195, 199 (Iowa 1956) (involving reciprocal wills). The court denied summary judgment on the will contest.

The court recognized tortious interference with a bequest is an independent cause of action distinct from the will contest, the same evidence will not necessarily support both claims, and the evidence to prove the tort focuses on the alleged tortfeasor. *See Huffey v. Lea*, 491 N.W.2d 518, 521 (Iowa 1992) ("[I]n a will contest, the testator's intent or mental state is the key issue; in an intentional interference case, the wrongdoer's unlawful intent to prevent another

---

[10] Pursuant to section 1031 of the United States Internal Revenue Code, capital gains tax may be deferred where property is exchanged for "property of like kind which is to be held either for productive use in a trade or business or for investment." 26 U.S.C. § 1031(1)(a).

from receiving an inheritance is the key issue."). The court also denied summary judgment on the tortious-interference claim.[11]

A jury trial occurred over eight days in late August and early September 2015. The court submitted Wesley's two counts—will contest and tort—to the jury, along with Cynthia's counterclaim for conversion of the farm machinery.[12]

During closing arguments, Wesley's counsel asked the jury to find conduct by Trudy and Cynthia resulted in Wesley losing his inheritance—one-half of the parents' $2.6 million estate, plus the right to purchase the rest of the farm. Wesley asked for compensatory damages based on his sisters' actions that resulted in his emotional distress from his mother's rejection, limits on his contact with his father, and his inability to attend Milton's funeral. Defense counsel argued the "two sisters did absolutely nothing wrong."

The jurors returned their verdict on September 11, 2015, finding Milton's June 2011 will should be set aside on two grounds—either Milton's insufficient mental capacity at the time of execution or due to undue influence exercised by the sisters. On the tort claim, the jury found in favor of Wesley, awarding damages for loss of inheritance of $1,183,430.50[13] and consequential damages of $295,857.62. The jury also found a preponderance of clear, convincing, and

---

[11] The court granted summary judgment on portions of Wesley's separate defamation claim. The court assumed Trudy's distribution of the "timeline" to attorney Hill in April 2011 constituted defamation but granted summary judgment based on the two-year statute of limitations. The court rejected Wesley's two claims for defamation by implication, ruling the sisters' request for a police presence at Milton's funeral was "not defamatory."

[12] On the conversion issue, Steve Boman testified Milton said he gave his interest in the farm machinery to Wesley. Daisy Schwichtenberg, from the Garner condo association, testified Helen told her that Milton had given the farm machinery to Wesley.

[13] This amount is one-half of the "total Iowa gross estate" listed by Cynthia as Milton's executor on the probate inventory.

satisfactory evidence supported punitive damages, assessing $59,171.53 from Trudy and $118,343.05 from Cynthia. The jury found for Wesley on the estate's counterclaim alleging conversion. The sisters filed a joint motion for judgment notwithstanding the verdict (JNOV) or for a new trial. The district court denied the motion, concluding all aspects of the verdict were supported by substantial evidence. Trudy and Cynthia separately appeal the court's denial of their joint motion.[14]

## II.      Scope and Standards of Review

We review an action to set aside a will for errors at law. *In re Estate of Bayer*, 574 N.W.2d 667, 670 (Iowa 1998). Tortious interference with a bequest is also an action at law. *See Frohwein v. Haesemeyer*, 264 N.W.2d 792, 795 (Iowa 1978). Accordingly, we review the JNOV rulings for legal error. *See Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010). "[W]e view the evidence as the district court did in ruling on the motion, that is, in the light most favorable to the party against whom the motion was directed," here Wesley. *See Bayer*, 574 N.W.2d at 670. Similarly, we examine the court decision not to instruct the jury as to qualified privilege for errors at law. *See Kiray v. Hy-Vee, Inc.*, 716 N.W.2d 193, 199 (Iowa 2006). We also review the punitive-damages award for correction of legal error. *See Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005). By contrast, we review the evidentiary rulings for an abuse of discretion. *See Hall v. Jennie Edmundson Mem'l Hosp.*, 812 N.W.2d 681, 685 (Iowa 2012).

---

[14] The sisters had the same attorneys at trial and for their post-trial motion, but they are represented by separate counsel on this appeal.

### III.     Will Contest

The jury decided Wesley proved both alternatives of his will contest, finding by special interrogatory that Milton lacked the mental capacity to make a will on June 7, 2011, *and* that the will was the product of the sisters' undue influence.

### A.     Testamentary Capacity

On appeal, Cynthia and Trudy argue Wesley failed to present sufficient evidence showing Milton was so mentally impaired he could not execute the will on June 7, 2011.  They contend Wesley did not offer any qualified witnesses to discuss Milton's testamentary capacity.[15]  *See Hart v. Lundby*, 137 N.W.2d 642, 647 (Iowa 1965).  On the flip side, the sisters highlight the lay opinions they elicited from Hill and Bertilson, who were both present at the will signing, as well as the medical opinion from Dr. Taylor—all confirming Milton's mental capacity to make a will on the specific day in question.

In support of the verdict, Wesley points to testimony from several sources that Milton had been growing forgetful over the years and required assistance from Helen with cooking, dressing, and bathing.  Wesley also relies on his father's 2007 videotaped self-assessment that his memory was "shot."

Iowa law presumes a testator has the mental ability to make a will and does so free from undue influence.  *In re Estate of Pritchard*, 443 N.W.2d 95, 98 (Iowa Ct. App. 1989).  In contesting his father's will, Wesley had the burden to

---

[15] The sisters acknowledge Wesley's presentation of evidence from attorney Bruce Walker, but they argue because Walker lacked medical or psychological expertise, his opinion was not helpful to Wesley.  As discussed below, we agree Walker's testimony did not assist the jury on the issue of Milton's testamentary capacity or on the issue of susceptibility to undue influence.

overcome that presumption by showing Milton lacked the mental capability to sign a will on the date of execution. *See In re Estate of Lachmich*, 541 N.W.2d 543, 545 (Iowa Ct. App. 1995). Although he was a nonagenarian suffering from dementia, Milton was legally competent to execute the June 2011 will if he possessed the requisite testamentary capacity, marked by the following factors: (1) knowledge a will was being made, (2) knowledge of the nature and extent of his property, (3) an ability to identify and remember the persons to whom he would naturally give his property, and (4) knowledge of how he wanted to distribute his property. *See id.* at 546.

Hill had worked as Milton's estate-planning attorney since 1997. Hill recalled taking more than an hour to go through the documents with Milton and Helen and having a conversation with Milton to determine his competency. Hill sensed some hesitation on Milton's part:

> [Milton] looked to Helen and said, is this really what we want to do, or something to that effect, and they had a discussion. And then [Milton] looked at me and he said, what would you do? And then before I answered he said, you can't tell me, can you? And I said no. He and Helen discussed a little further. Again, on the second occasion, he turned to me and said, what would you do? And then a second time he said, you can't tell me, can you? And I said, no, you have to make up your own mind.

Hill testified, after hesitating, Milton picked up the pen and signed the document. Hill believed Milton understood what he was signing and intended to extinguish Wesley's inheritance. Hill's belief was seconded by Bertilson, who testified Milton "mulled it over" before signing because it was a "hard thing to do for him because he loved his son." Bertilson recalled Helen stating her mind before the signing, making the case to her husband that Wesley had "lived for free for a long

time," sold the farm machinery and kept the money for himself, and didn't have time for them anymore. Bertilson believed Milton was "brokenhearted" over the decision to disinherit Wesley, but she did not observe Milton having any "memory issues" that day.

Wesley's evidence is unpersuasive because it does not focus on the day Milton executed his mutual will. *See In re Gruis' Estate*, 207 N.W.2d 571, 573 (Iowa 1973) (stating plaintiff's burden is "to establish testator, at the exact time of the making of the will," lacked testamentary capacity). The testimony cited by Wesley shows only Milton's gradual mental deterioration over time. Milton's mounting forgetfulness and dementia diagnosis, standing alone, do not render him unable to dispose of his property by will as he saw fit on June 7, 2011. *See generally Drosos v. Drosos*, 103 N.W.2d 167, 172 (Iowa 1960) ("No mere impairment of his mental or physical powers, so long as he retains mind and comprehension sufficient to meet the tests . . . , invalidates his will."). Thus, the jury's verdict cannot be sustained on this ground. We turn to the alternative basis for Wesley's will contest.

### B. Undue Influence

The sisters' JNOV motion alleged insufficient evidence that they had "the disposition to unduly influence Milton for the purpose of procuring improper favor" and that the will was clearly the result of undue influence.[16] On appeal, they

---

[16] The district court instructed the jury that to show Milton's will was the product of undue influence, Wesley was required to prove the following propositions by a preponderance of the evidence: (1) at the time the will was made, Milton was susceptible to undue influence; (2) the defendants had the opportunity to exercise influence and carry out the wrongful purpose; (3) the defendants were motivated to influence their father "unduly to get an improper favor"; and (4) the result, reflected in the will, was clearly brought about by undue influence. *See Burkhalter v. Burkhalter*, 841 N.W.2d 93, 105-06 (Iowa 2013)

focus their will-contest challenge on the mental-capacity alternative. Neither provides more than a cursory statement contesting the proof of undue influence.[17] Because neither sister develops an argument or cites authority on the undue-influence alternative, we affirm the ruling denying the sisters' JNOV motion and setting aside the 2011 will on that basis. *See Midwest Auto. III, L.L.C. v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 431 n.2 (Iowa 2002) (holding random mention of an issue without elaboration or supporting authority fails to preserve the claim for appellate review); *Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("In a case of this complexity, we will not speculate on the arguments [a party] might have made and then search for legal authority and comb the record for facts to support such arguments."); *see also* Iowa R. App. P. 6.903(2)(g)(3) (noting that the failure to argue an issue or cite authority in support of it in the brief may be deemed a waiver of that issue).

In any event, the e-mail exchanges and other facts detailed above demonstrate ample evidence of the sisters' undue influence. *See Bayer*, 574 N.W.2d at 670-71 (discussing undue influence in a will contest).

## IV.    Tortious Interference with Inheritance

The tort of interfering with an inheritance subjects a person to liability if by "tortious means" he or she intentionally prevents another from receiving an inheritance from a third person if that inheritance would have otherwise been received. *See Huffey*, 491 N.W.2d at 520 (quoting Restatement (Second) of

---

(stating "a requirement that causation be clearly established" in element four "is not inconsistent with the preponderance-of-the-evidence standard" for other elements).

[17] Additionally, neither Cynthia nor Trudy tie those conclusory statements to their more lengthy arguments concerning undue influence as an element of Wesley's tort claim. In making this observation, we do not imply the two claims are identical.

Torts § 774B (Am. Law Inst. 1979)).  Here, the district court instructed the jury that Wesley had to prove the following propositions: (1) he expected to receive an inheritance from Milton upon Milton's death, (2) Trudy and Cynthia knew of Wesley's expected inheritance, (3) Trudy and Cynthia intentionally and improperly interfered with Wesley's expectancy by way of defamation or undue influence, (4) there was a reasonable certainty Wesley would have received an inheritance but for his sisters' interference, and (5) Wesley suffered damages as a result of his loss of inheritance.[18]

On appeal, Trudy and Cynthia jointly challenge the third and fourth elements.  Trudy raises a separate undue-influence challenge based on her alleged lack of motivation to interfere with her brother's inheritance.  Viewing the record in the light most favorable to Wesley as the non-moving party, we assess whether substantial evidence supports the challenged elements.  *See Winger v. CM Holdings, L.L.C.*, 881 N.W.2d 433, 445 (Iowa 2016).  Evidence is substantial if it forms the basis for the jury's reasonable inference of facts at issue.  *See id.*

---

[18] The sisters argue Wesley needed to prove they improperly interfered with *the sole or predominant purpose* to injure or financially destroy him, citing the business case of *Compiano v. Hawkeye Bank & Trust*, 588 N.W.2d 462, 464 (Iowa 1999) (distinguishing intentional interference with contract and intentional interference with *prospective* business relations by noting *prospective* theory required plaintiff to prove defendant acted "with the sole or predominant purpose to injure or financially destroy" plaintiff). Wesley contends the "sole or predominant" language misstates the proof necessary for this noncommercial tort.  We have recognized the difference between interference with a bequest and a commercial tort.  *See Hosier v. Hosier ex rel. Estate of Hosier*, No. 00-1225, 2001 WL 1451137, at *7 (Iowa Ct. App. Nov. 16, 2001) ("[The plaintiff] has cited no authority, and we have found none, in which Iowa recognizes the theory of intentional interference with prospective economic benefit as a legal theory in a noncommercial context.").  Assuming error is preserved, it is not our role to graft a new standard of proof into the existing law of interference with a bequest.  *See Spencer v. Philipp*, No. 13-1887, 2014 WL 4230223, at *2 (Iowa Ct. App. Aug. 27, 2014) ("[T]he task of materially altering substantive or procedural rights is best left to the General Assembly or the Supreme Court of Iowa.").

## A. Element Three: "Undue Influence"

Wesley had to prove by a preponderance of the evidence that his sisters intentionally and improperly interfered with his expectancy by way of undue influence. We consider the existence of a confidential relationship in actions alleging undue influence. At trial, Wesley argued his sisters enjoyed a confidential relationship with his parents, and the court instructed the jury on factors showing a confidential relationship. On appeal, neither sister disputes the existence of a confidential relationship. Therefore, as to Milton's will, "a suspicion, not a presumption, of undue influence, arises where the dominant party in a confidential relationship participates in either the *preparation or execution of a contested will.*" *Bayer*, 574 N.W.2d at 675. While neither sister was present at will signing, they were active in their parents' estate planning from 2008 when they arranged for new powers of attorney and moved their parents away from Wesley. Thus, a suspicion of undue influence exists here.

The sisters jointly contend "the first shortcoming in Wesley's evidence was one of timing." They point to the limit on Wesley's inheritance imposed by the fourth amendment to the trust, resulting in a life estate and farm income. They assert the record does not show they engaged in "improper interference" or employed "wrongful means" before March 2009. They contend Wesley did not establish a basis to recover damages. Continuing, they state:

> Assuming *arguendo* Cynthia and Trudy engaged in tortious interference in 2011, the effect of that interference was merely to invalidate the June 7, 2011 will, and return Wesley to the inheritance he would have received immediately prior to it. But Wesley had no inheritance immediately prior to the June 7, 2011 will, other than a one-third interest in farm machinery that was sold anyway and personal property. With respect to the farmland, he

merely had a life estate in one portion of it, which he made no attempt at trial to place a value on. Thus, in the absence of tortious interference in 2008 or 2009, Wesley has not satisfied his burden of proving damages with reasonable certainty.

This argument fails because neither in the district court nor on appeal do the sisters challenge their parents' June 7, 2011 revocation of the trust or the simultaneous execution of deeds. At this point, the Bowman Trust has been dissolved. *See Linkmeyer v. Brandt*, 77 N.W. 493, 494 (Iowa 1898) (discussing revocation of a trust). Setting aside the will based on the sister's undue influence would not return Wesley to the life estate created under that revoked instrument.

Further, the record includes evidence of undue influence predating the March 2009 amendment to the trust. Trudy specifically testified "from 2008 to 2009" she provided care for her parents, dealing with "their emotional and physical needs." A reasonable jury could have found the sisters started their campaign of influence in 2008, when (1) the dispute over Helen's health care occurred, (2) the sisters acted to obtain their own powers of attorney, and (3) they moved their parents away from Wesley and closer to them. *See Bayer*, 574 N.W.2d at 670 ("Evidence is not insubstantial simply because it may support contrary inferences."). At that time, Wesley expected to receive one-half of his parents' property.

Finally, Wesley was required to show an "*intended bequest.*" *Hosier*, 2001 WL 1451137, at *7. Here, under each estate-planning instrument drafted before the 2011 will, Wesley received some inheritance. *Cf. id.* (noting plaintiff's failure to present prior documents legitimizing his expectancies). We conclude the jury

was justified in finding the sisters wielded undue influence over the expected bequest and affirm the district court on this issue.

We next turn to Trudy's separate claim she had no reason to exert undue influence over her father because she did not benefit from the changes made to his estate plan. She asserts her status did not change—she remained the beneficiary of one-half of Milton's estate. Assuming her status did not change, we are not persuaded. Wesley was not required to prove Trudy's inheritance was diminished or increased, instead, the jury was instructed to consider a number of circumstances "in deciding if there was undue influence."[19] Further, a reasonable jury could have found Trudy had the disposition to unduly influence even if her inheritance stayed the same. The "improper favor" logically could be the ousting of Wesley to the benefit of her sister, Cynthia. The sisters' e-mails show joint action to undermine Wesley. *See Kerber v. Eischeid*, No. 15-1249, 2016 WL 1696929, at *4 (Iowa Ct. App. Apr. 27, 2016) (finding breach of fiduciary duty where conservators removed beneficiaries to whom they were

---

[19] The instruction listed the following circumstances:
   1. Dominance over the maker of the will; 2. Whether the condition of the maker's mind was subject to such dominance; 3. Whether the distribution of the maker's property is unnatural, unjust, or unreasonable; 4. The activity of the person charged with undue influence; 5. Whether defendants had the opportunity and frame of mind to exercise undue influence. Activities may include suggestion, request, and persuasion short of controlling the will of the maker, but they do not alone constitute undue influence. Consider such activities along with any other evidence of undue influence; 6. The intelligence or lack of intelligence of Milton; 7. Whether Milton was physically or mentally weak; 8. Whether Cynthia Cramer and/or Trudy Burton was the controlling party in a confidential relationship with Milton; 9. Whether Cynthia Cramer and/or Trudy Burton was the controlling party in a fiduciary relationship with Milton; 10. Any other facts or circumstances shown by the evidence which may have any bearing on the question.

"antagonistic" or to whom they had "demonstrated their dislike"); *Bronner v. Randall*, No. 14-0154, 2015 WL 2089360, at *8-9 (Iowa Ct. App. May 6, 2015) (finding sufficient evidence decedent's sister, who was not a beneficiary, improperly interfered with a prior beneficiary's expectation of inheritance, such interference benefitting the sister's daughter). We find no merit to Trudy's argument.

**B.     Element Three: Defamation**

Wesley also had to prove the sisters intentionally and improperly interfered with his expectancy by way of defamation. The tort of defamation concerns the invasion of Wesley's interest in reputation or good name by "the publication of written or oral statements." *See Barreca v. Nickolas*, 683 N.W.2d 111, 116 (Iowa 2004). Wesley alleged he was defamed by his sisters' statements on the following topics: his drug use, his responsibility for cutting off their parents' cable television service, the DHS complaint of elder abuse, and stealing Milton's farm equipment.

On appeal, the sisters first argue they did not improperly interfere because they had a good faith basis for their conduct and statements. As to all four categories of defamatory statements, the sisters contend Wesley "merely established" that they "discussed information with Milton and Helen that they had every reason to believe was true." The sisters contend their conversations with their parents and attorney Hill "were so deeply rooted in undisputed facts" that those communications "cannot possibly rise to the level of wrongfulness necessary for a tortious interference claim."

The jury considered whether the sisters acted in good faith. The court instructed that "[o]ne who by legitimate means merely persuades a person to disinherit a child and to leave the estate to the persuader instead is not liable to the child." But the jurors did not find the sisters were persuaders using legitimate means. The jurors, who had a front-row seat for assessing the credibility of the witnesses, did not believe the sisters acted in good faith. After reviewing the sisters' emails with Hill, as well as their statements critical of Wesley made to their parents and others in the community, we find substantial evidence to support the jury's finding.

In a related argument concerning the defamation alternative, the sisters complain the district court should have instructed the jury on qualified privilege, an affirmative defense providing immunity from liability for defamation in some circumstances. *See id.* at 118 (explaining qualified privilege exists with respect to an otherwise defamatory statement "when (1) the statement was made in good faith; (2) the defendant had an interest to uphold; (3) the scope of the statement was limited to the identified interest; and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only"). Wesley argues his sisters did not identify "which statements to what persons" would be covered by qualified immunity. The district court refused to give the instruction, concluding qualified immunity did not apply to the "matter at hand."

The sisters assert this instructional error requires us to remand for a new trial. We find no error in the district court's refusal to instruct on qualified immunity. First, at trial, the sisters did not specify the "occasions" giving rise to a qualified privilege. *See id.* (explaining court's task was "to determine whether the

occasion of [the defendant's] statement[, a city council meeting,] was qualifiedly privileged"). Second, on appeal, the sisters do not cite any cases applying qualified immunity to testamentary actions. We affirm the district court on the issue of qualified immunity.

### C. Element Four: Causation

On appeal, Cynthia and Trudy argue their actions were not clearly the cause of Wesley's loss of inheritance.[20] They assert Wesley and Cherie's deteriorating relationship with Wesley's parents, particularly his mother, loomed as independent motivation for disinheriting him that had "nothing to do with Cynthia or Trudy."

We defer to the jury's finding of causation because it was supported by substantial evidence. The jury learned of the deteriorating relationship but was free to credit Wesley's version of the events. Wesley offered testimony to show Milton was susceptible to unfair persuasion by his daughters—his physical strength was limited, his hearing was impaired, and his memory was declining. Milton relied on Helen for his daily needs, and Helen was receptive to disparaging information about Wesley and Cherie. A reasonable jury could conclude Trudy and Cynthia had the opportunity to exercise influence over their parents' decision-making and to carry out the wrongful purpose of excluding Wesley from receiving a share of the family farm that he had long worked with his father. Two prime examples of their opportunity to inject themselves into their parents' estate planning were the sisters' efforts to move their parents closer to

---

[20] They again contend Wesley, as a matter of law, failed to prove "reasonably certain" damages. We previously rejected this argument and need not repeat our analysis here.

them and farther from Wesley and their arrangement with attorney Hill to act as liaisons with him because their parents did not have the ability to send emails.

A reasonable jury could also conclude, based on the record, that the sisters were motivated to influence their father to unduly get an improper favor. Wesley submitted evidence of the increasing Iowa land values around 2009 and of the exploration by the sisters' husbands into the possibility of selling the Boman farm. Substantial evidence supported the jury's conclusion the parents' mutual wills disinheriting Wesley were clearly brought about by the sisters' undue influence.

Like the district court, we find sufficient evidence of all the challenged elements of the tort, including causation.

## V. Evidentiary Challenges

### A. Admission of Wesley's Expert Testimony on Legal Concepts

Wesley called attorney Bruce Walker as an expert witness.[21] On appeal, the sisters claim the district court abused its discretion in allowing Walker to opine, over objection, that Milton lacked the requisite capacity to execute a will and that Milton and Helen were subjected to "undue influence" by Cynthia and Trudy. They argue Walker was improperly allowed to explain what the law is and to then offer an opinion on whether the facts satisfied the legal standards.[22] We include a portion of the challenged testimony below:

---

[21] A lengthy discussion occurred outside the presence of the jury before Walker testified. Both sides agreed expert opinion was not admissible to explain the applicable law.

[22] Wesley contends Cynthia and Trudy did not preserve error on this claim because they did not raise it in their post-trial motions and did not address error preservation in their appellate briefs. In their reply briefs, the sisters contend they preserved error by seeking to exclude Walker's testimony by filing a motion in limine and renewing their objections during his testimony. We agree the sisters' trial objections citing "lack of competency of

Q. Do you have an opinion, based upon reasonable certainty, as to whether . . . Milton and Helen Boman were susceptible to undue influence on June 7, 2011 when the mutual wills were executed? . . . . A. Okay. It looked to me at the time of the execution and before, but particularly at the time of the execution, based on the information that was provided by Mr. Hill's office, that when the actual documents were presented there was a pause in the execution, which was telling to me. Apparently the information was that Mr. Boman wanted these documents prepared, he wanted to execute them, and [Mr. Hill] was informed that [Mr. Boman] understood what he was doing. And then when it came time to actually sign the documents, there was a pause, and it wasn't clear because the memos and so forth weren't completely clear as to how long that pause occurred, but it was at least several minutes.

When there's a pause like that, it triggers bells in the mind of an attorney that's supposed to be supervising the execution of documents that maybe the individual either did not understand the documents or did not agree with the content and the effect of the documents.

. . . .

Q. Do you have an opinion, based upon reasonable certainty; as to whether Milton or Helen Boman were susceptible to undue influence and also had the requisite testamentary capacity to sign those wills and to execute the other documents . . . that were presented to them on June 7, 2011? . . . . A. It appeared from the information that I reviewed from Mr. Hill's file that there wasn't much, if any, concern about Helen Boman's capacity to execute documents. There were, however, indications in Mr. Hill's file about his concern about Milton Boman's ability to competently understand and execute documents. That's spread throughout some of the emails and other notes that I was supplied to review. On the question of undue influence, I've already said that I believe the daughters were influencing Mrs. Boman, Mrs. Boman was then influencing Milton Boman. And the most telling portion of the influence that I found was that in the actual execution of the documents themselves during this period that I mentioned about the pause, Mrs. Boman prompted Mr. Boman to recall that that's what they'd agreed to and that's what he wanted to do. I think that speaks to undue influence pretty clearly.

---

this expert to make such an opinion" preserved error on the admissibility of Walker's opinion evidence. As to appellate procedure, we agree with Wesley that Cynthia and Trudy contravened the rules by not citing the place in the record where the evidentiary issue was preserved. *See* Iowa R. App. P. 6.903(2)(g)(1). While this omission is an inconvenience to the appellate courts, in this case we opt to reach the merits of the sisters' claim regarding expert testimony.

In addressing the sisters' objections, we first acknowledge Iowa's liberal rule allowing "expert opinion testimony if it will aid the jury and is based on special training, experience, or knowledge with respect to the issue in question." *Bornn v. Madagan*, 414 N.W.2d 646, 647 (Iowa Ct. App. 1987). "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Iowa R. Evid. 5.704. But when an expert witness opines on a legal conclusion or on whether the facts of the case meet a given legal standard, that opinion holds no value for the jury. *See In re Det. of Palmer*, 691 N.W.2d 413, 419 (Iowa 2005), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). "[T]he jurors are fully capable of applying the facts of the case to the law provided to them by the trial judge." *Id.* Such an opinion is *inadmissible* under rule 5.702, which requires the specialized knowledge of an expert witness to assist the trier of fact. *Id.* at 419-20 ("Whether an opinion couched in legal terms is excludable . . . depends on 'whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate.'" (citation omitted)).

In this case, the district court allowed attorney Walker to give opinions about Milton's "susceptibility to undue influence" and Milton's "testamentary capacity"—specialized legal concepts not within the common knowledge of lay persons. Walker's opinions were inadmissible under rule 5.702 and the analysis in *Palmer* because his views invaded "'the province of the court to determine the applicable law and to instruct the jury as to that law.'" *See id.* at 419 (citation

omitted). Walker's opinions were couched in legal terms that carry "a separate, distinct, and specialized meaning in the law different from that present in the vernacular." *See id.* at 420 (explaining "the question, 'Did T have the capacity to make a will?' would be excludable because 'capacity' is a legal term with a more precise, specialized legal meaning than the lay understanding of that term," though the danger of jury confusion could be avoided if the questioner explored the basis for the expert's opinion in factual terms). Accordingly, such testimony by Walker should have been excluded. *See id.*

Although the district court mistakenly allowed attorney Walker to express his opinions on specialized legal concepts, not every erroneous admission of evidence requires reversal. *See Mohammed v. Otoadese,* 738 N.W.2d 628, 633 (Iowa 2007). Reversal is only warranted when the admission affects a party's substantial right. *Id.* (citing Iowa R. Evid. 103(a)).

On the question whether allowing Walker's testimony amounts to reversible error, Wesley contends Trudy and Cynthia were not prejudiced by Walker's testimony because their trial attorney asked the same "inappropriate" questions to their expert witnesses—Dr. Michael Taylor and attorney Gregory Kenyon. The sisters reply: "A party cannot, over objection, ask inappropriate questions of an expert witness, then turn around and claim waiver or lack of prejudice when the other side is forced to respond in kind." *See Thavenet v. Davis*, 589 N.W.2d 233, 236 (Iowa 1999) (finding legal error in allowing expert testimony on legal standards prejudiced litigants and forced them into Hobson's choice of offering equivalent opinions).

If we had resolved the will-contest claim on the issue of testamentary capacity, we would be more inclined to find the erroneous admission of attorney Walker's opinions rose to the level of reversible error. But as stated above, we agree with the sisters' position that Milton had the mental wherewithal on June 7, 2011, to execute a will. Our decision to uphold the jury's verdict on the undue-influence alternative is not significantly impacted by Walker's inadmissible opinions because, on appeal, neither Cynthia nor Trudy directly challenged the undue-influence basis for Wesley's will-contest claim. Accordingly, we find no prejudice resulted from the erroneous admission of Walker's testimony in the will contest. *See Palmer*, 691 N.W.2d at 422 (finding error harmless where issues discussed by expert witness were not disputed).

As to the tort claim of intentional interference, which included an element of undue influence, we conclude that to the extent attorney Walker was allowed to offer inadmissible opinions, when the record is considered as a whole, the sisters were not prejudiced.

The jury's view of Walker's expertise was likely tempered by his disclosure that he had not drafted a will for twenty-five years and had no recent experience in probate matters. Moreover, the sisters countered Walker's testimony not only with their own experts, but through extensive cross-examination. For example, on cross, Walker acknowledged if Wesley or Cherie said things that upset either parent, that could have influenced their estate planning; Cherie's harsh phone call "probably did" influence Helen; and if Milton heard Cherie call Helen "an old hag," it could have influenced Milton. Walker further agreed that accusations from people outside the family about Wesley's drug use could have influenced

Wesley's parents, as could have Wesley's decision to sell farm machinery or his less frequent visits. In the context of Milton's pause during execution of the wills, Walker admitted, when someone is about to disinherit a child, "they should be thinking about it." Walker's testimony on cross-examination supported the sisters' theory of the case point by point. When the record is viewed as a whole, the court's admission of Walker's testimony did not result in reversible error.

## B.      Exclusion of Evidence Concerning Wesley's Past Conduct

Wesley filed a motion in limine seeking to exclude evidence of his alleged use of illegal drugs, specifically methamphetamine. The district court declined to make a preliminary ruling on admissibility because it "wasn't sure of what the context would be and what the evidence necessarily would be showing in detail." Wesley revealed in his own testimony that during his divorce he had used marijuana and cocaine, sought treatment, and had several relapses.

Midtrial, counsel for the sisters informed the court they intended to offer testimony from a former deputy sheriff concerning drug investigations in which Wesley's name had come up. Wesley's counsel argued the evidence was not relevant because it had not been communicated to Helen or Milton and would be unfairly prejudicial. The district court ruled the prejudicial effect of the proposed evidence substantially outweighed its probative value. *See* Iowa R. Evid. 5.403. The court did not find "a real solid connection" between the information sought to be offered and Milton's decision to revoke the trust and change his will.

Additionally, the sisters made an offer of proof seeking to admit Trudy's testimony that in 2006, she was visiting her parents when Wesley brought her a phone book and asked if she saw a highlighted name, but no names were

highlighted.  In the same time frame, according to Trudy, Wesley told his parents "people were chasing him and the police were after him."  The court also excluded this proffered testimony, finding the timing—two years before the March 2009 amendment to the trust—detracted from its probative value.

On appeal, the sisters argue the court abused its discretion in excluding this evidence because it supported their position that they had a good-faith basis for their suspicions Wesley was using drugs.  They also contend the remoteness of the evidence went to its weight and not its admissibility.

The balancing of probative value against grounds for exclusion in rule 5.403 rests in the sound discretion of the district court.  *See Thompson v. City of Des Moines*, 564 N.W.2d 839, 846 (Iowa 1997).  Here, the district court reasonably determined the tendered evidence was too remote in time and lacked a significant nexus to Milton's estate planning.  *See Goche v. Goche*, No. 09-0761, 2010 WL 2925140, at *9 (Iowa Ct. App. July 28, 2010) (upholding exclusion of family discussions remote from the date the will was executed). Given its weak probative value, the district court exercised sound judgment in deciding evidence that Wesley was acting paranoid and was the target of drug investigations tipped the scales too far toward the danger of unfair prejudice.

### VI.    Punitive Damages

The jury awarded Wesley $118,343.05 in punitive damages from Cynthia and $59,171.53 from Trudy.  Both Cynthia and Trudy argue on appeal that Wesley failed to show that either sister's behavior was "willful and wanton." Cynthia claims she "simply participated in conversations that were driven by others and based on natural inferences from undisputed facts."  Trudy also

contends she "she engaged in discussions with her parents about natural inferences from undisputed facts" regarding Wesley's conduct, pointing to her testimony she loved her brother "but they disagreed about issues relating to their parents' care."

Punitive damages "serve a vital function in our tort system." *Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854, 865 (Iowa 1994). Such damages exist to punish and deter the defendant and to deter "like-minded individuals from committing similar acts." *Ryan v. Arneson*, 422 N.W.2d 491, 496 (Iowa 1988). The primary focus of our review is the relationship between the offending party's wrongful conduct and the punitive damage award. *See id.* To merit an award of punitive damages, Wesley was required to prove by a preponderance of clear, convincing, and satisfactory evidence that each sister acted in willful and wanton disregard for his rights. *See* Iowa Code § 668A.1 (2013); *Wolf*, 690 N.W.2d at 893. The "willful and wanton" element requires Wesley to show the sisters' "conduct constituted actual or legal malice." *See Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 396 (Iowa 2001). Wesley can prove actual malice by evidence of ill-will, personal spite, or hatred. *See Wolf*, 690 N.W.2d at 893 (citation omitted). Wesley can prove the "legal malice" alternative by evidence of "wrongful conduct committed or continued" by each sister "with a willful or reckless disregard" for his rights. *See Gibson*, 621 N.W.2d at 396 (stating punitive damages are not awarded for "merely negligent conduct").

In upholding the jury's award of punitive damages, the district court cited the following evidence: the overall hostility of the siblings' relationship, including

the fact Trudy and Cynthia did not talk to Wesley from mid-2008 until the trial date; the sisters' failure to ask Wesley or his neighbors about the sale of any farm machinery; the sisters' accusation Wesley stole the machinery; their claim Wesley was still using drugs and that he or Cherie had reported Helen to the DHS for maltreatment of Milton; and the sisters' allegations Wesley was abusive to his mother and took financial advantage of his parents.

In our review, we would further point to the sisters' callous, intentional decision to keep Milton's death a secret from Wesley, even though Wesley had farmed with his father for more than thirty years, thereby preventing Wesley from attending his father's funeral. This conduct, along with the conduct detailed by the district court, satisfied the "actual malice" alternative for both Cynthia and Trudy. Accordingly, we affirm on this issue.

In conclusion, we affirm the district court's denial of the sisters' motion for JNOV or a new trial. We have considered all the issues presented by Cynthia and Trudy, and any issues not specifically addressed are deemed meritless.

**AFFIRMED.**